The first case today is 16-377-Garcia-Todilla-at-all-and-consolidated-cases, and number 16-2437-Brigade-Leveraged-Capital-Structures-Fund-B-Alejandro-Garcia-Todilla-at-all-and-consolidated-cases. Thank you. Good morning, Your Honor. Eric Bernstein on behalf of AIA Investments. If I may have about three minutes for a little time, Your Honor. Yes. Thank you. First of all, we appreciate being here on expedited review. In the time that I have this morning, I'd like to touch upon three things. The first is the harm that PEAJE is suffering as a result of the taking of its collateral. The second is why the protection is the correct standard of cause here. And the third is why the District Court is failing to hold a hearing. Focusing on harm, PEAJE holds $63 million in limited recourse bonds. By limited recourse, I mean that, ordinarily, PEAJE can look only to its collateral, the total evidence, to be paid. When we started back in May of 2016, PEAJE's collateral consisted of two buckets. The first bucket consisted of cash equal to about 10% of the principal and interest outstanding on the bonds, on deposit with the fiscal agent. The second bucket is the future total evidence. Now here we are in January. The second payment, I understand, first payment in July, second payment now has been made. And the cash, the cash is gone or almost gone. That money is gone. So all we have to look forward to now is the future payments, the future total evidence, which we don't know that much about. We don't know how much they are, what they're actually going to be. We think they're going to be insufficient to both cover the future payment obligations and to make up for what has been taken. But the harm has been done. The last thing that comes to our minds is that the standard. I read your briefs well, and I'm feeling consistently today that the future revenue stream won't be enough to cover all of the obligations, not just the debt obligations, but also refunding and effect collateral. And so I understand the adequate protection rule, which you would like us to apply. We don't want that. We actually, if a creditor is oversecured, we need to get rid of the collateral and the interior debt at the point to eliminate what the courts call an equity cushion. And I don't see you ever having a bargain value to blow or even any brief to us on appeal. Yes, Your Honor. But the proof from there is a question of fact. It depends on the value of the future revenues. Can you point to anything in your files with the district court where you proposed, where you even alleged that the diminution of the value of the collateral would be enough to take it down below, not just impair the collateral, but reduce it so much that it would impair the debt? Well, we already remembered then that that was what was going to happen. I don't see it. Your Honor, I would need you to pay Sykes to our brief. I don't have it right in front of me, but I will do that. But the point is that we need a question of fact. And we never had it here. And I also want to point out that the debtor here, the commonwealth's burden to show that there's no harm to us. It's not our burden to show that when they take our collateral and spend it, that we will be harmed. It is their burden to show that it won't be. When they take your cash, when they take your property, and they dissipate it when they spend it, it is their burden to show that we will be adequately protected nonetheless. And the adequate protection standard is very simple. It comes from the law. And they must basically show there's a reasonable assurance of a single replacement. They have to show that the cash today is being replaced by something. And they have to show that when they're going to stop taking our collateral, if they keep taking our collateral infinitely into the future, it will never be taken. We're obviously harmed. Could I just add back to the burden question that you just touched on and explain to me the basis to your assertion that the burden would be on them, given that the statute, I mean, we start out the language and it says, for a cause shown. Correct, Your Honor. And shown, I think, suggests that the parties seeking relief will show cause, which kind of sounds like you have some burden here. We do. We have a burden of showing we have a security interest. We have a burden of showing that they are taking our property and spending it. Those are undisputed facts. We've established our burden. The burden that it is for them to show that they're taking our property and dissipating it is not causing us harm. This standard of cause is borrowed from Section 362 of the Bankruptcy Code. Section 362 says that a reason why we're not expanding bankruptcy may be granted, including the lack of adequate protection. Then the concept of cause is borrowed there into the reason here. We take a subtle meaning of that concept here. The subtle meaning includes the ban on the burden of showing that they're taking our property and spending it is not causing us harm. That's what adequate protection means. The burden of proof is laid into that very concept. Now there's an important reason why that must be the standard here. PROMESA itself borrows us from a certain remedy to stop them from taking our property. The statute itself prevents us from a certain remedy. That in and of itself generates a conflict with the Constitution, with the Fifth Amendment, where someone is continually taking the property and we can do nothing about it. Or nearly all kinds of remedies that are being proscribed by the statute. To really conflict with the Constitution, we must have a mechanism that allows us to show that we are entitled to relief on this day unless nobody can show. Back to the burden, you just said we must have a mechanism that allows us to show. Correct. So back to the question, how long do we have to show and when? Yes. So what do you say to the point that when you take the word shown and you add in policy considerations that we're talking about a temporary stay, we're talking about a desire to reduce suits, why wouldn't it potentially lead to an argument that before a suit is going to be allowed, a creditor needs to come in and at least make a prima facie claim that it's actual debt obligation is being impaired by the reduction in collateral below. You wouldn't claim that, would you? Well, we can, and in the same way we would have under Section 362. Under Section 362 when we must show cause, same idea. Paul McNabney would come in and say, we have a lien, a security interest in this property that's undisputed. Our collateral is maintained and spent. That is undisputed. The board of ventures prevents a demonstrate. But there are bankruptcy cases, are there not, that say that even in that situation the creditor still has the burden of showing that there is no equity cushion. It's not cotton dry, am I right? Well, actually in this context it is. First of all, they refuse to tell us what the future revenues are going to be. We don't have that information. Now, if we don't have money, if we, if we, the cash is supposed to accumulate. The cash as we understand it is now gone. There will be no money there to make the July payment coming up in 2017 unless they turn those revenues back on. It takes time for those revenues to accumulate. On pages 34 and 35 of our brief, we trace the history of the adequate protection concept to the real holding case that Congress adopted when it crafted the adequate protection concept. And there, the court was very clear that the adequate protection concept clearly encapsulates this idea that if you take someone's property, a promise of future payment, which is all that they are offering here, a promise of future payment from the future revenues is never adequate protection unless they can show, and it's very important, that the future revenues are so great that it doesn't make a difference. Picture the apple farm, where the farmer has apples, grows apples, and they're there, and the bank hasn't loaned the apples to secure a debt. The farmer sells the apples and now has cash. If the farmer spends the cash, what does the creditor have to look to? Nothing. The prospect of future apples that may or may not be grown, but it might be okay if the farmer can show rightfully, I'm going to grow all these future apples, and they're going to have such a great value, that it doesn't matter that I just spent all your cash from this crop. It's okay to make you wait. But when the farmer spends the cash, sells the apples and spends the cash, which is what they have done here, they then have to come forward and show you that there is a reasonable prospect of a suitable substitute, a suitable replacement that will be provided. Let me ask you a question about that. If Congress thought that the bankruptcy code way of dealing with this in terms of adequate security was so utterly critical when we're dealing with a sovereign or somebody with the ability to tax or otherwise raise revenue through fees, tolls, etc., why do you suppose they didn't put that language in? Two reasons. One, what I'm really asking is how much flexibility do we have? Yes. I would suggest, even though they can cause and even specify it, the flexibility, I think, has to be counted in the adequate protection concept. And here's why. The adequate protection concept is itself based on the Fifth Amendment. The adequate protection concept recognizes that when a debtor files for bankruptcy, the automatic study kicks in and prevents the secured creditor from exercising his rights when his collateral is being dissipated. And Congress rightfully chose, and this came from the case law before Congress did this in 1978, that where the collateral is being taken or dissipated or is depreciating in value in bankruptcy, the secured creditor has a constitutional right to protection. Otherwise, the automatic stay itself affects the taking. But if the Fifth Amendment argument hinges on the way the reserve account is set up, the way the expenditures are made, isn't that essentially a contract claim as opposed to a property claim? No. The Security and Justicial Bank Springboard decision that's cited on page 11 of my brief, citing the Bradford case, another Supreme Court case, illustrates that a lien in collateral is a property right, not a contract right. It's a property right. A lien is a purchase. Under Article 9 of the Uniform Commercial Code, a security interest is a purchase interest into collateral. It's an ownership interest. But the payment that you're talking about is a twice-a-year payment. Correct. That is a result of contract. That's just how many collaterals can be distributed. Yes, so I'm talking about the revenue stream. In bankruptcy, it is true, if you were in a bankruptcy proceeding, and we're probably going to get there, there'll be another stay, not more of the way. If in a bankruptcy proceeding, it is true that debtors have some leeway to alter the terms of payment, but that's not what we're talking about here. We're talking about the security of payment, the collateral itself, the property, and when it is dissipated, when it is spent, that we have to show in order to be able to spend it, that it's not causing us any harm. Why? Because we are prohibited from the 5th Amendment from use to stay, from exercising our rights. So to preserve the Fifth Amendment concern and applying the canon of constitutional rights, the court should interpret the cause standard under Proviso to be the same as the cause standard under Section 362 of the Bankruptcy Code to avoid that conflict with the Constitution where debtors can continue to take the collateral for as long as they want and we can do nothing about it. The standard shouldn't be the same. It should also be the same under the barren statute canon because the canon with the cause standard under the Bankruptcy Code is important here, and so the Senate will need those when they include the requirement of adequate protection. Adequate protection requires that they show that a suitable substitute will be provided for what is being taken. They never showed that below. We never had hearings. As the Martin case from the 8th Circuit establishes, adequate protection is a question of fact. You cannot have a court decide adequate protection without a hearing, other than a jury hearing. Thank you. Thank you. Thank you. Good morning, Your Honors. Sparkles with her name for the Altair Appellants, holders of bonds issued by the Employees Retirement System. May I reserve two minutes for rebuttal? Yes. Thank you. Your Honors, it is undisputed that since July of 2016, the ERS has received over $100 million of employer contributions that it has diverted from appellants' collateral accounts. It is also undisputed that appellants have a lien on that property and all employer contributions received by the ERS, and in the absence of adequate protection to protect that property interest, appellants are entitled to relief from the PROMESA state. Appellants are both statutorily and constitutionally entitled to adequate protection. What the adequate protection requirement does is it essentially reconciles the competing interests of debtors and creditors. Debtors get some breathing room, secure creditors are barred from seizing their property during the state, and in exchange, the adequate protection requirement is meant to protect secured creditors from the loss of value of their collateral. What the Commonwealth is advocating is essentially a one-sided automatic state where debtors' interests are protected, and secured creditors' rights are essentially disregarded, and that is not the statute that Congress enacted. I understand that it is plain that the collateral potentially has been reduced here, but let me ask you the same question I previously asked you. In your claim here in this case, that the reduction in collateral is enough to push you to the point where there is no equity cushion, or even worse, such that the payment of the debt itself is now in jeopardy, because as I understand it, you, I think, stipulated that there will be payments through the current extension of the Moratorium Act, and then in those, thereafter, will be roughly $19 million a year, where the debt obligations are roughly $14 million a year, or a month, rather. So it sounds like in 20 months, you'd build up the $100 million backlog. So I'm having trouble seeing where you've alleged the type of impairment of collateral that would rise to the level of inadequate protection. So two responses to that, Your Honor. First, if it is in fact true that all future employer contributions are going to be paid, the bonds may well be oversecured. The problem is here that appellees themselves have said very clearly that future employer contributions are uncertain. And in fact, the only fact in the record below, in which the district court made its decision about the certainty of future employer contributions, is that they're uncertain. The ERS has said that in plain terms. The Commonwealth, just a couple months ago, in October, when it submitted its fiscal plan to the Oversight Board, said that. We can't trust in those future employer contributions. So they cannot then say we are protected by those very contributions. And the district court, remember, the district court found that the reason we are adequately protected is because there is this future revenue stream. And the only fact in the record about that revenue stream was that we put forward statements by appellees themselves  I'm not certain, but I apologize. And if those payments are uncertain, the bonds are not oversecured. And the second response to that is, is this a burden of appellees to show that, in fact, the bonds are oversecured? They have not to this point, and perhaps they will clarify, if it is their position that the bonds are oversecured, and if they would like to prove as an evidentiary matter that that is the case. But they did not make that showing below. And there is no record on which this court can make that showing. And the district court didn't find that to be the case. Could you clear up a little confusion regarding, as I understand it, the $75 million in funds that are in the bank tax, that you would be all fine, everything would be okay, if it were moved over to the trust account? Yes, your honor, so it is our, so, they converted, as of the time of the hearing, as of November, it was around $75 million. The E.R.S. has said it is receiving approximately $18.8 million a month, and so there is somewhere more than $100 million now. What they are saying is that they are diverting our money, but they don't actually need it. They are not using it. The E.R.S. has represented to this court that it is simply sitting in an account, being held, and not used. And does your money not trade, follow those funds into that account? Correct, it does not. And what we have said to them is, if you are not using the money, instead of holding the money in an operation account, where you are free to spend it tomorrow, simply place it in a separate account, attach a lien, or hold the money for our benefit, until a court decides who has the right to that money. That is all we have asked for, and that would have ended this litigation. It is all we asked for in the district court. And do you agree with the E.R.S. asserts that it is prohibited from making that transfer by the moratorium act, or executive order, if you presume to be asking? What they say in their brief simply suspends an obligation to make the transfer, but at least the English translation does not indicate that it prohibits them from making that transfer. So, even if the moratorium act prohibits them from making that transfer, that is why we are saying, even if you are not transferring it to our collateral account, if you are not using it, put it in a separate account. Don't keep it in an operating account where you are free to spend it. Put it in a separate account, and agree not to touch the money for the state, and when a court decides whether we should have access to the money or not, that is when the money will be moved. So, we understand that their hands might be tied by the moratorium act in some respect, but if they are not using the money, and they have no need for the money, they should separate the money, and that is all we have asked, and they have refused to do so to this point. And so, do you agree that the moratorium act not only suspends an obligation, but prohibits them from performing that obligation? Yeah, I would say the moratorium act suspends the obligation, even if it prohibits them, that does not prevent them from simply separating the money. Right now, the money is sitting in an operating account, and they are representing to this court they are not using it, but they are free tomorrow to spend that money, or a lien does not attach to that operating account, and they have stipulated that they pay expenses out of that operating account. At the end of the day, appellants are entitled to adequate protection, and in this case, they have not proven that they are adequately protected by that future lien on employer contributions. And this is not a case where appellants are seen, despite there is a lot of rhetoric in the Commonwealth Brief about the financial woes facing the Commonwealth. And that may well be true. But this is not a case where the Commonwealth is saying to this court that it needs appellants' property to keep the lights on. They are saying to this court that they are diverting our property, money that is ours, that it is undisputed that it is ours. They are diverting that money, just keeping it in an account for no reason whatsoever, and holding that money. We cannot start telling secured creditors that they will have no access to their collateral, that it will be diverted by a debtor with no adequate protection whatsoever, and in this case, for no reason whatsoever. Secured creditors are constitutionally entitled to adequate protection. In your case, do you think it makes any difference? Suppose we agree with you about the standard, that adequate protection, there is the Bankruptcy Code, adequate protection, and we look to see whether there is an equity cushion of at least 20% or more, or something like that. Does it make any difference in your case to whom the burden of productions and the burden of persuasions is allocated? Your Honor, in this case, it does, because the appellees below have the burden of proving that we are adequately protected. They have not contested that, and the district court held that to be so. They did not meet that burden below. They did not even attempt to show that there was an equity cushion because no hearing was conducted. And for that reason, at a minimum, if it is their claim to date that we are adequately protected because there is an equity cushion, this court should remand the case so they have the opportunity to prove that. But on the record, as before this court, there is nothing that this court can use to decide that there is an equity cushion. All that's in the record about that future revenue stream are statements from appellees themselves that those payments are uncertain. And on that record, the court cannot sign, and the district court incorrectly found that appellants are adequately protected. Thank you, Your Honors. Good morning, Your Honor. I'm going to introduce the court, Aaron Murphy, on behalf of the individual commonwealth defendants. Congress enacted Section 405 of PROMESA for the expressly enumerated purpose of providing the commonwealth with an immediate but temporary reprieve from costly credit or lawsuits. Now, withstanding Congress's findings that this temporary stay is essential to stabilize the region, appellants insist that they should be able to regate their claims immediately, even though they conceivably are being paid in full right now and conceivably will be continually paid in full throughout the duration of PROMESA's stay. The district court's conclusion that they should have to wait out the remainder of the brief stay that's left is a classic interlocutory order over which we believe this court lacks jurisdiction, but in the event the court concludes otherwise, should affirm the decision below because the district court was manifestly correct in concluding that appellants fail to demonstrate anything that differentiates them from all the other creditors to whom this stay is plainly intended to apply. Well, listen to the fact show that the debt payments will remain permanent for now and the commonwealth took all of the collateral that would secure future debt payments 100 percent of it. There's even contention that as the commonwealth is in the process of doing that, PROMESA is prohibiting the creditor from going to court to protect itself? Well, the creditor can go to court and try to demonstrate clause to lift the stay and that's going to depend on the particular facts. Is the creditor going to have a lot of the clause that I just described? I think it depends on what the collateral is. If it's hundreds of the collateral? If the collateral is purely cash, at the end of the stay, they get to litigate their claims and seek money damages for the full amount of what they lost during the stay. If the money is being given and disbursed to a million people, so there's no claim, then there's no unsecured claim for money damages against the commonwealth. The whole idea of security seems to me to stand as a secured creditor rather than unsecured. Sure, and these creditors would be secured creditors. They are right now and they'll be secured creditors. I'd like to ask you to address, should I propose, hypothetically, that all the collateral is taken? Right, and in that circumstance, you'd be a secured creditor. You'd be a secured creditor who's attorney would go on, but you'd have a claim to litigate against the commonwealth saying, you disobeyed my security and therefore you owe me money damages for the full value of my claim. That doesn't differentiate what's going on here from what's going on here. The commonwealth could go out and take all of the collateral, essentially of all creditors in Puerto Rico, and there's nothing that the creditors can do about it until after the fact, putting damage claims that themselves would be unsecured. Is that what you're saying? What I'm saying is that a creditor would need to come in and make a showing about, not just that their collateral is being taken right now, but that they won't be able to recover their collateral once the state lists. And that's what these creditors can show. It's being disbursed to the general population. And they demonstrate that not only is all of their collateral being dissipated, but there will be nothing left at the end of the day. There will be no ability for them to get money damages to get back the money they've lost, and that might be an instance where you could demonstrate consolence per se. But that's not what we have here. What we have here is a creditor who's being paid right now, and we haven't demonstrated that they won't be paid once the state lists, or that even if they weren't paid at some point, they wouldn't have all the remedies that both MESA and Act 21, the World Trade Act, contemplate, because both of those statutes fully preserve their secured interests and their ability to litigate those secured interests once the state lists. So you're moving next to a case that holds that the elimination of collateral is not something that is cause for relief, merely because you would have an unsecured damage claim in which you might or might not recover your money. In the bankruptcy context, we're operating under a rule that we don't think is the right rule here. In the bankruptcy context, there is an adequate protection standard written into 362. There's also a burden shifting regime written into 362 that says it's the debtor's burden to demonstrate adequate protection. Both of those provisions were conspicuously excluded from Section 405 for MESA. It does not include an adequate protection standard, and it does not... They repeatedly said, and it's our burden. Under 362, it's the debtor's burden, but that's because the statute explicitly says that it's the debtor's burden to demonstrate adequate protection. That is another provision that Congress did not import into Section 405, and maybe for this reason Congress didn't import a burden shifting regime for proving adequate protection is because Congress also did not import an adequate protection standard into Section 405 of PROMESA. It didn't intend that standard to apply, and that's because you don't need an adequate protection standard in this context because PROMESA is quite different from the bankruptcy stay. A bankruptcy stay operates for the duration of the entire bankruptcy. So, in effect, what it says is you're never going to get to effectively proclaim that you're collateral. That's what's usually going on in an adequate protection case. They want you to proclaim that you're collateral. And the automatic stay in bankruptcy says you don't get to do that, period. We're letting the debtor keep your collateral for the duration of the stay. That, as courts have recognized, raises some distinct diplomatic concerns that have led to an adequate protection standard that Congress put into that provision. Here, that's not what's going on. PROMESA doesn't say that the debtor... For one thing, there is no debtor right now. There is no Title III bankruptcy proceeding here. The commonwealth is not a debtor. All that's going on is there's essentially a stay put in place for everyone to figure out whether we're going to proceed to a Title III bankruptcy proceeding, whether we're going to have voluntary restructuring, whether some of these obligations may continue to remain in force in the same shape that they are right now. This is very different from anything you have in a bankruptcy context. And it's also temporary. It ends February 15th. We're at the very latest, May 1st. And at that point, either the court here will be able to litigate their claims in full and seek money damages for whatever injury they believe that they have suffered, or we will be in a Title III proceeding, at which point the 362 stay will kick in. Because in Title III, unlike in Section 405 on PROMESA, Congress actually imported 362 in its entirety. So if we get into a Title III bankruptcy proceeding, there's a different set of arguments that they can make. They'll be able to say that they're entitled to adequate protection and that we need to make a showing about whether they have it. I was closing the bar door. It's a little too late here. If it's during the 7-1s, all the collateral has been taken. I keep coming back to it. Who gets the first burn? Because, you know, the burning is constitutionally imposed, so we have a statutory instruction. But I'm just having great difficulty with your argument that there's the 7-1 window where the government can entirely, entirely destroy the value of collateral 100%, and that that wouldn't in and of itself be good cause. Now, I'm not saying they're entirely destroying it here. There may be in the future income streams, as the Court found, enough. But you're asking us to take a pretty broad proposition that seems to run into a real takings problem. Well, your argument does not have to resolve the hypothetical that you suggested in order to resolve this case because, as you recognize, that's not the clean hit. If you reject that hypothetical, then it turns the argument back to whether there is adequate protection here or perhaps whether the burden of raising the question of adequate protection was or was not met in the allegations made, which is a different conversation than you've been urging us to have so far. Sure, and we do think that the right way for the Court to look at this is not... I mean, I don't think it would be consistent with what Congress is trying to do in PROMESA to say that the condo has to go through elaborate hearings where it demonstrates exactly, you know, for every dollar that we're spending to try to ensure that residents are receiving essential services, which Congress expressed findings in the statute that part of the point of the stay was to give the condo the resources it needed to ensure that its residents will receive essential services. So the idea that, you know, for every dollar diverted, the condo won't have to demonstrate that it's also setting aside the exact equivalent dollar to ensure... That's not the adequate protection test. You just have to show someone has to address the issue of whether there's an equity cushion or not. And if they're oversecured, then they're oversecured and go at it. Absolutely, which is why we don't believe that they could satisfy adequate protection even if that were the correct standard here. But we do believe that the right standard for the courts to apply is a more traditional equitable balancing of the equities in the case, looking at not just whether they're suffering some sort of harm as a result of the Commonwealth's actions, but whether they are suffering irreparable harm that cannot be remedied at the end of the stay. And I think that has to be the right standard because we're talking about a statute that was enacted on the express promise that the Commonwealth was using pledged revenues to pay for essential services. And the executive orders they want to challenge, the first one, Executive Order 18, allowing the diversion of total revenues, that was promulgated more than a month before PROMESA was enacted. And there were...that is also implicit and explicit in PROMESA that there would be creditors who wouldn't be paid during the duration of the stay. So PROMESA enacted this statute understanding that there were creditors as to whom the Commonwealth and its instrumentalities wouldn't live up to 100% of the bargain that they had made during the stay. How do you suggest we deal with Section 405K? I think Section 405K as a form of...an additional form of protection for one's interests. But doesn't it suggest that we should not interpret PROMESA in a way as to destroy security interests since Congress said PROMESA wasn't to destroy security interests? No, what I think that 405K is saying is, now assuming the fact that the Commonwealth didn't have to live up to its obligations during the stay, that doesn't mean that you don't have all your rights the moment the stay lifts. So it's a form of protection saying, you know, unlike in a bankruptcy proceeding, we're not actually allowing the Commonwealth to discharge or alter your means, your security interests, your contractual rights. All of those are fully intact, and the moment the stay expires, you can go into court and allege and try to prove that, you know, that these actions that were taken were inconsistent, that they caused you harm, that you're entitled to damages. So I actually think that 405K is further proof that Congress intended to allow the Commonwealth to do the things that it knew the Commonwealth was doing when it enacted this statute, and instead of creating a broad outlet to basically let every creditor out from under the stay, Congress said, what we're going to do is ensure that your rights are fully protected once the stay lifts. And the four clause standard is really intended to be a safety valve to deal with the extraordinary creditor, not the creditor who's just making basically the same argument that any creditor, at least any secure creditor, could make, which is, you know, I don't think the Commonwealth is living up to 100% in health. What an extraordinary creditor would be in your mind? I think an extraordinary creditor, one, you might have a creditor who has a form of collateral that actually cannot be remedied if it's lost during the stay. It's something other than money. You know, money can only be remedied with money. If they have a particular form of collateral that was being diminished and could not be made up for after the stay was lifted. You might also perhaps have a creditor who has unique circumstances of their own that make it irreparable damage if they aren't getting paid now. Now, of course, I do think that you'd at least have to be a creditor who's not getting paid, which these creditors aren't. These creditors are being paid in full and conceivably will be paid in full. So in our mind, you know, that makes them basically the very last creditors that Congress would have wanted to be able to lose the stay and engage in litigation about whether they should be entitled to effectively two lines of security for their interest instead of just one. When you say that the statute should, or contemplates sort of a traditional balancing of the equities, so shouldn't there be a hearing? I think that the way that this case ended up getting to the court, there were stipulated facts that basically stipulated to all of the facts that were relevant to the analysis here, because they stipulated that they will be paid throughout the stay, and there were stipulations about what the revenue streams were. In the Altair case, there's specifically the stipulations Judge Peata referenced about exactly what the levels of the revenue streams are. So everything was data that the court needed, and in the Pagani case, there had just been a hearing from which hundreds of pages of testimony were designated on the specific question of whether the HTA revenues were going to be sufficient in the future. The claimant there was an insurer saying, we think we're going to have to cover claims in the future because we think these revenues are going to run out. So it's not as if the district court made a decision here without facts. In that particular context, I think it really, it was incumbent on these parties that they thought given the record that they put before the court of stipulated facts, of testimony, of the information that the court reasonably could have viewed as sufficient for it to make its ruling, I do think it was incumbent on them to say, hey, hold on, you need to reconsider this ruling because we think we have something additional beyond what we already put before you that you didn't realize would have been relevant, and neither of the appellants here did that. What is the result of this ongoing litigation had on the whole notion of a briefing room? Well, there's a lot of testimony that the commonwealth put on about that in the Brigade hearing, and some of that was designated in the Payanhe proceedings regarding about how it has caused the commonwealth to have to divert resources. Having a hearing not only requires someone to come testify, it requires pulling people away from what they should be doing under PROMESA, which is getting the commonwealth back in fiscal order to prepare for the hearings, to help prepare and review all the papers that are being filed in all of this litigation. So it really has been a tremendous distraction to the commonwealth, which is exactly the opposite of what Congress intended when it said, we're going to give you this day precisely because we don't want you to be spending your time in costly creditor litigation when it would be better to put that time to the use of in suing to the needs of the people of Puerto Rico and getting Puerto Rico back into fiscal order. And just one more question. Regardless of who has the burden, if we're honing in on the notion of equitable cushion, what specifically in the evidence demonstrates that there is an equitable cushion? The stipulated record evidence. Sure. I think the stipulated evidence in Altair demonstrates that even without the contributions from the commonwealth employees, which are only suspended temporarily in the case of executive order, even the non-commonwealth contributions are higher than the stipulated amounts necessary to service the debt. And as to the HTA payoff party, you know, I don't understand them to ever have even suggested that they think the HTA revenues are going to be so low that they can't be paid, particularly given that payoffing is actually, they're kind of the first priority set of creditors under the HTA because they're the earliest set of bonds. So basically you have to have like no HTA revenues coming in for them to have any real risk of not getting paid. And that's why, as I understand it, really their complaint has only been, they don't think there will be sufficient revenue to not only pay them but reinstate the reserve accounts, and we don't think that's the right plan. And even, you know, we don't think they're entitled to an equity cushion that would not only ensure that they're being paid, but also kind of ensure that they have a secondary line of, you know, kind of security for getting paid in the future. There are no further questions. Thank you. May it please the Court, Richard Chesley on behalf of ERS, the employee retirement system of the Commonwealth of Puerto Rico. I appreciate the Court's time here this morning, and I will be brief. As counsel for the Commonwealth has covered many of the topics, we run two ways. But with respect to the issues before this Court, and regardless of how the Court resolves certain of the legal challenges, the appellants appeal with respect to ERS on one crucial set of facts to which they stipulated the law and which the district court relied upon in its holding. That quote, there were sufficient money in the debt service and reserve accounts to service the bondholder debt until April 1st of 2017 after the PROMESA stay expires. And not a single principal and interest payment will be missed while the PROMESA stay remains in place, and therefore the appellants face no financial harm as a result of the stay. Moreover, based upon the liens that are held in the pledged property, and we'll talk about that in a moment, the bondholders are secured not only until the conclusion of the PROMESA stay, but for many, many years to come based upon the stipulated record that was before the district court. Again, while counsel for the Commonwealth has adequately covered many of the issues we want to touch, I do want to raise a couple of points that I think are extremely relevant for this panel's consideration. First of all, the appellants take the position that the standards for relief from the automatic stay under Article IV of PROMESA, and when we're talking about Article IV of PROMESA, should simply mirror those under Section 362 of the Bankruptcy Code. Namely, the cause for relief from the automatic stay should include, but not be limited to, which the Bankruptcy Code provides, adequate protection. They advance the position despite the fact these two statutory schemes have different language and were intended for very different purposes. So then, what did Congress intend? And I think the congressional history underlying Article IV of PROMESA is very critical to see what did Congress intend. Well, the House report on Section 405, which is cited in our brief, states under the Section 405 automatic stay upon enactment, if a party is determined to be subject to irreparable damage because of the imposition of the stay, the district court is authorized to grant relief from the stay to such party. Of course, if Congress wanted to impute the adequate protection standards under Section 362 and Section 361 under Article IV, it certainly could have, and it absolutely did that with respect to Article III of PROMESA, but we're not in the realm of Article III. We're simply during this limited phase of the interim relief. And how do you address the argument that, as a constitutional matter, taking so much of the collateral is to impair the ability to pay the debt is itself irreparable harm because it's a taking? And this goes to the factual issues that were before the district court on the ERS appeal. Right, but put aside the facts. You're suggesting we use an irreparable harm standard rather than an inadequate protection standard. Yes, Your Honor. And I'm having trouble seeing what the difficulty is. If we had a true scenario, assume the facts didn't show blatant lack of adequate protection, wouldn't that be irreparable harm? Personally, in our case, that's not the factual weapon. To the extent, Your Honor, I do agree to the extent we had a situation where there was a blatant taking of all of the property, then I think there would be a compelling argument that that is irreparable harm. And then could you also address the issue that I asked counsel about earlier? What is it that actually prohibits ERS from making the payments? I understand there's legislation that has suspended your obligation to do so. The Militarian Act prohibits fee transfer. Can you refer to any language in that? With respect to the Militarian Act, Your Honor, I can reference that to the court, but it limits the ability, it limits the gains now of contributions from the Commonwealth to ERS, not the non-Commonwealth employees, and it limits our, it precludes our ability to then transfer amounts that we are holding to the bondholders. Okay, the signs and the words didn't seem to help on finding language that did that. We apologize, Your Honor. We can file a supplement to the extent that is necessary. But I do want to touch on my last point on the facts. Yes, Your Honor. Please file that. We will, Your Honor. And if I can, I do want to touch on the facts of our case. Specifically, since July of 2016, the beginning of the previous estate, the ERS has been holding over 75, currently holding over 75 million in the operating account based upon contributions from the non-Commonwealth employers. Counsel for the appellant made mention of the fact that there's always representations or statements as to the uncertainty with respect to future contributions. There is no uncertainty with respect to the non-Commonwealth contributions, which amounts to approximately $20 million per month. In fact, in 2015, again, this is in the record, ERS received about $224 million. It's solely in non-Commonwealth employer contributions. This is in the face of a debt service obligation of $166 million. The undisputed evidence was presented before the district court that, in fact, the equity cushion exists. And with respect to that $20 million, it continues to flow in, and the appellants do have a lien. If you look at the pledged property definition that's included in the stipulated facts, they have a lien in that collateral. They have a lien in the reserve account collateral, which will pay them. And they have a lien in the future revenue. And the last thing that I think is critical is what the judge did with respect to, if I may finish, Your Honors. What the judge did, the district court did, with respect to the balancing of the equities, and he made particular mention of the fact that once the stay is alleviated, the future revenue stream, which is an additional $250 million approximately per year in Commonwealth employer contributions, will then be made available back to ERS. This, in combination with more than adequate amounts to pay the debt service based upon the non-Commonwealth, gave the district court more than adequate factual support to grant the relief that he did. Thank you, Your Honors. Thank you. May I please record Michael Luskin for the Financial Oversight and Management Board, Puerto Rico. The appellant in seven appeals involving the intervention motions and the amicus in the two lift-stay appeals that we've been hearing about this morning. Mr. Luskin, are there any pending cases in the district court in which you're waiting to hear about your intervention status? Yes, one called Lex Claims, which is mentioned in our opening appeal brief. I know time is limited, but I am going to spend a moment on the seven appeals that are consolidated here. We believe that the district court improperly applied a narrow and mechanical test of Rule 24 governing intervention. The result, of course, was the deniers' participation in the seven cases, and the order should be reversed. The district court found what it referred to as a procedural deficiency, but there was none. The court apparently believes that what the board was required to do is to file one of the pleadings of the kind listed in Rule 7, an answer with counterclaims and so on, but that's wrong. What the rule requires is a pleading that sets out the claim or defense for which intervention is sought, and that is precisely what we did. We believe the district court should have taken note of and taken into account the specific procedural postures of the cases in these three consolidated FIAHE cases. There were no complaints on file. Two of the three parties had included proposed complaints with their motion papers, and one of them, Altair, did not include a proposed or draft complaint, so there was nothing to respond to in the traditional Rule 7 sense. In some of the cases where there was a complaint filed? Yes, the brigade cases. Why didn't the board just file an included one-page answer, right? Because an answer does not mean to respond to allegations against you that were done. Well, I think that, you know, we did struggle with that, Your Honor, to tell you the truth. We did feel that, frankly, responsibly to reply to those, to answer those allegations, we would have had to take a position on the merits, on the preemption, the taking, and the other constitutional claims. Why, under Rule 8b, you don't have to respond to allegations that aren't against you, right? Well, I can, you're correct, and I will, I'll But that was your thinking, you thought you might be taking the risk of having to respond. Well, we were, yes, we did not want to take a position, frankly, on any aspect of these constitutional claims, and that relates to the stay issue as well. Having the oversight board take a position on the merits, or refusing to take a position on the merits, has an impact on our ability to negotiate. Our goal, as we see, our statutory role is to operate in a level playing field, frankly, a quiet playing field. That's what the stay is about, and that's what we said in our intervention papers, and that's what we explained to Judge Pistosa as to why, in our motion for reconsideration, why we didn't take positions on the merits. We still have not taken positions on the merits, and we believe that during this quiet period, before Title 6 or Title 3 proceedings are filed, we should not. Our goal is to deal with those claims in the conference room, not the courtroom, and see if we can negotiate restructuring agreements or consensual fiscal plans. What we did do in all seven cases, Judge Piata, is to address the sole live issue that was then before the court, which were the pending motions to lift stay, and there can be no doubt about what our position was, and that is, after all, the goal of Rule 24. We think the district court should have addressed our motions on the merits, not relying on the procedural deficiency, to use his words. Had he done so, he would have referred to Section 212A of PROMESA, which allows us to intervene in any action against the Commonwealth. He could have done so under Rule 24A2, which allows us to intervene as of right, based on our interests, our unique position, the adequacy of representation, and so on, and we would then have participated in the case below. We think that this court's prior decisions support the oversight court's view on these motions. The one case cited in the court below was a case where there was no proposed pleading at all submitted, and we would agree. If the putative intervener doesn't bother to put in a proposed pleading of any kind, then I could see denying the motion. But even there, in the court's decision in Liggett, there was no intervention motion, but intervention was allowed. Particular facts, but the right decision, clearly. So those seven orders should be reversed. Unless the court has questions on intervention, I'd like to turn to the merits. The amicus position on the Liggett state motions, and we have suggested, the oversight court has suggested, a standard that is somewhat different than the other parties. We do not believe that the sole touchstone should be adequate protection, though I will say, Judge Beata, that your hypothetical would, I believe, present a situation where adequate protection might trump everything else. But this is nowhere close to a case where 100% of anyone's collateral is being taken and destroyed. We also don't believe that irreparable injury alone is the sole touchstone, and others have pointed out that bankruptcy code 362 includes adequate protection as reason, as cause for lifting the stay. Certainly Congress knew what it was doing when it drafted 405E. It did not copy that language, notwithstanding the fact that it copied or incorporated verbatim 98 other provisions of the bankruptcy code in Section 301 of PROMESA. When it wanted to copy, it knew how to copy, and it did not do so here, and I think that for the purposes of statutory construction, that ought to be enough. So why should the PROMESA standard be a different standard? And my answer is that PROMESA establishes a very different regime than the bankruptcy code. PROMESA establishes what I've referred to as a quiet time, the breathing room, which is actually part of the findings in the statute itself and purposes in the statute itself. It establishes breathing room, a quiet time for the oversight board to do the very tasks that it's mandated to do by the statute, which is to organize, to collect information, to designate covered instrumentalities, to develop projections, to review budgets, to develop fiscal plans, and to negotiate out-of-court restructuring agreements, and to assess the advisability of going the out-of-court route or the consensual route of Title VI of PROMESA or the non-consensual or only partial and consensual route of Title III, a bankruptcy. And it's supposed to do it. We are charged with doing all of that during the quiet period. Only after we decide which way to go do we commence a bankruptcy proceeding, if that's the decision, to go into Title III, and in Title III, 362 of the Bankruptcy Code, along with 97 other provisions, expressly govern verbatim. But that's not where we are. We're in Title IV in the quiet period, and it is very important. Forcing decisions on constitutional issues to go to the intervention point would impede negotiations, if not render them outright impossible. In PROMESA, and I'm going to say, wait a minute, quite a concession, because you used the word might, but you were attempting that a complete elimination of the collateral might be enough to outweigh everything. I'm going to stay with that for a second and not treat it as a concession, but treat it as a talking point. Why would Congress have wanted to say, well, that's enough, but if you just take half the collateral, well below the equity position, that's not enough. It's a taking just as much. Well, for adequate protection and constitutional purposes, the only taking that matters is a taking that threatens the secured creditor's interest in the debtor's interest in. Yes, so that's the rule. In the equity position, creditors have a lot, but we're talking about a scenario where you go well below the equity position. And I believe that in a situation where the facts show that a secured creditor at the outset of a case is clearly and unequivocally moving from over-secured to under-secured in a way that damages and threatens its ability to be repaid, it's a consideration. However, and the Supreme Court in Timbers points this out, that duration of the stay is important. The Morrell case, the Timbers case, really don't help the appellants here. That case involved a 10-year note after under a plan of reorganization that stripped away the basket of rights that the secured creditor had previously. The duration is important. She says, oh, there's not enough time to detain me. But if there's enough time to detain you all, then it's gone. Following through that hypothetical, but I must add to what my brethren have stated up here, which is that we are so far away from that kind of situation. The record establishes over-security here. There is cash and cash flow that is more than sufficient to pay the debt service, and certainly during the duration of the stay, from day one of the stay through the end of the stay next month or whenever it ultimately ends. So I think what you're saying makes sense, that it's not just the duration, but it's the duration in relationship to the burn rate here, and if the burn rate can eliminate the duration, it's not creating enough to impair the collateral so that it threatens the payment of the debt. And poor ideology would have an issue. Your Honor, yes, that is correct, and that is what distinguishes this case where we have a perpetual income stream from virtually all. It's not only cash collateral cases or adequate protection cases that the appellants cite. Many of those cases were real estate cases or equipment cases where the cash collateral, the future rent that was being offered as adequate protection, was rent under a lease with a term of years. It was in one of the cases there was 13 months' rent left, and in other of the cases the key tenant was not renewing so that the money was going away. So in those cases, if you took away months one and two of rent, you weren't able to replace them with months 13, 14, and 15, as you are in these cases where total revenues are perpetual, and the employer contributions are perpetual, and the excise tax and motor vehicle fees that the HTS, the highway bondholders, have security interests in, and those numbers and those facts are in the record in the stipulations that were put into the district court. I'm not sure. I've lost track of the time here. I think I'm probably way over. I have one more point that I ask your indulgence. Please make your point. Okay. I apologize. I'm going to... I do think the perpetual revenue stream distinguishes these cases from the typical cash collateral situation and the hypothetical that Judge Gaeta has put forward. And I'll end by making the point that the standard that the Oversight Board is advocating is a balancing of a variety of factors without giving any one factor complete priority. It's not a new or unfamiliar standard. I mean, courts constantly weigh factors to assess cause in many situations where the statute doesn't list them or give examples. PROMESA uses cause in only two instances. One of them is the one we've been talking about. The other one does not list reasons. The Bankruptcy Code and the Bankruptcy Rules authorize courts to act for cause or for cause shown in 71 separate spots by my count, of which reasons or examples are given in only 10. The Federal Rules of Appellate Procedure authorize this court to act for good cause in seven instances and in none of them is an example given. Courts do not need examples to figure out what the material relevant factors are. And if in your hypothetical, if the facts presented are like your hypothetical and constitutional issues are implicated, then yes, that factor may come to the fore. But here, that is not what we have. There is no damage. There is no need for adequate protection. If there were a need for adequate protection, it's there in the equity cushion, and the equity cushion in this case is different because of the perpetual revenue. I think that absent any further questions from the court, I should stop. I've gone way over my allotment. I have one. In terms of the approach that you are advocating to take, I'm sure you've read Judge Basosa's Breguet case. Yes. Are you advocating something more along those lines? I think that Judge Basosa was not as expressed as I have been in my brief of listing the particular factors. I think, in fact, what Judge Basosa did is decide that he has to balance all of the factors and that among the factors that he was required to include or to assess was adequate protection, and I think he did that. I would, speaking for the oversight board, like to see a decision from this court that is more expressed and that could be more expansive on the balancing that makes it clear that the CROMESA regime pre-deficient is different from the bankruptcy regime post-filing of the Title III case, for instance, so that in other cases we have guidance and Judge Basosa has more guidance. So, yes. Thank you. Thank you very much, and again, I apologize for going over so much. Not at all. Thank you, Your Honor. Judge Thompson, there is no evidence in the record whatsoever of an equity cushion for pay-a-hay in these bonds. Zero. Counsel paid to Rose. You can't share about there being no money, et cetera. There is zero evidence in the record to substantiate those claims. We didn't have an evidence-sharing hearing. We had an expert witness who was going to testify about the projections and things. That was not allowed. These bonds are going to go out for 19 years. Taking the cash today and spending it is real harm. Judge Kayaba, the burden right now is 100%. They are burning 100% of the cash. Section 405K, if I may say so, they're not supposed to be impairing on collateral during the so-called quiet period. They are not maintaining the status quo. They are impairing on collateral, yet they're violating the very statute they seek shelter under and saying there's no cause for living this day. Even though they're not complying with the statutory regime, they are supposed to be honoring. They are impairing our collateral, and they are doing it in a way that is causing us harm. Why should they have the burden? They have all the information. We do not. They know what the projected revenues are. We do not. Only they know when we will stop taking our collateral. We don't know. We can't gaze into the crystal ball. They have refused to take a position on when they will stop taking our collateral. They have tipped their hand in this proceeding before the court. They basically have said, we will continue taking the collateral. We make no commitment to when we'll stop taking the collateral. And they're adequately protected because they have a lawsuit, an unsecured claim. They can sue us later for taking their collateral. But it's unfair what the circuit said in the Alorica case. So, if there had been a hearing and you had put your expert on, would your expert have simply said, we don't know? Our expert would have said, looking at what information we were able to get from them, that the projected revenues may well not be enough to cover all the future obligations and make up for what they're taking now. Remember, the way this works is cash is being collected, whole revenues are being collected, and as they come in, they're supposed to be put into the accounts to make sure there's enough there to make the next payment. They stopped doing that last May. There was enough in there at that time to cover us through this month. But because they're not putting any more of those whole revenues in, when we get to July, there will be nothing there to pay us. We will be in default. And the argument is, well, we'll just continue to take the property, and you can sue us later. You can have an unsecured claim, a lawsuit against us for taking your property. But as the third circuit said in the Robo case, which I cite on pages 22 and 23 of my reply brief, quote, a lawsuit is too speculative in nature to offer adequate protection, close quote. And the reason for that is because substituting a lawsuit, a future right to sue, is never the same as cash in the bank today. They are going around saying, we don't have enough money to pay anybody, but trust us. We can spend all your collateral today, and we'll pay you in the future. Just not what you asked us. You asked us for a site to where we are. This is going to harm us, and it's not going to be enough below. I asked for a site where you told the judge below that your debt, the debt itself, was not going to get repaid as a release from the state. Wow. Now, the problem is that we were not able to have our evidentiary hearing to come and make the arguments before the court. You had a very long motion in which you specified the harm, and as I read that harm, you were simply saying that the collateral itself is being reduced. I did not see any claim. Maybe I missed something. Let me do the best I can. I'll give you three sites. The Joint Appendix, page 32, paragraph 43. The Joint Appendix, page 35, paragraph 50. And the Joint Appendix, page 171, at paragraph 4. And to follow up on Judge Thompson's question, did the judge deny you any discovery that you sought to do? We sought to get the financial projections of the revenues, what they were likely to be, so our expert witness could try to prepare and come up and see whether those projections were going to be adequate. Judge DeSouza, over the objection, did require them to give us those projections about the future revenues. And based upon that evidence, our expert was going to testify that the future revenues are likely to be insufficient to allow us, not only to be paid in full going forward, but to make up for what they're spending currently. I think I'm going to ask my question again. Did Judge DeSouza deny you any discovery that you tried to do? He did not. But remember, Your Honor, the key point that I'd like to reiterate, it was our burden to show we have a security interest. That's undisputed. It was our burden to show that basically they're taking our collateral, they're dissipating it. That's undisputed. Those are undisputed facts. With that crime aphasia case made, it is their burden to show that it's not causing us any harm. And all you've heard from them today is, well, if there's any harm from this, you can sue us in the future with a speculative lawsuit, you know, against us, even though they claim they don't have any money. Again, that's not adequate protection. And the reason why it must be their burden to show adequate protection, again, is because they have the information. In addition, one key fact that's necessary to do the calculations is, when will they stop taking the collateral? Because, Judge Carallo, this case is your hypothetical. If they just keep taking the collateral into the future, the burden rate is 100%. If they keep going and going and going and going, if they plan to... But the regime changes in May at the latest rate. But, Judge Carallo, what happens at that point is, we then substitute nearly one stay for another. When they file for bankruptcy, they then get the automatic stay, and then we have more hearings and more delay, so we get to one year, two years, perhaps, after the fact, where they continue to take our collateral. Each day they continue to take our collateral, the hole gets bigger and bigger and bigger and bigger, and the problem becomes the problem akin to what happens with poor debtors who get behind on their mortgage payments. They may be able to make a payment in the future, but they never catch up on the arrears. And in the end, the collateral isn't going to be sufficient to cover the hole. And again, it's not sufficient. The remedy they suggest is not sufficient. That we can just sue them in the future, and get an unsecured claim against them for money damages. They basically say they don't have the funds to pay. So taking collateral today, without adequate protection, is real harm. Under the Barra statute canon, we take the settled meaning of the adequate protection concept, which was designed to protect secured parties, just like Piaget in this case. The balancing test that opposing counsel advocates is a test under which relief would never be granted. Because in their view, really the only thing that matters is to have this quiet period. Well, that would be all right. This is beginning to become a run-on sentence. Yes, Your Honor. Thank you very much. Your Honor, I just have three brief points in rebuttal. First, with respect to the burden. When we're there with the burden, it is clear that in this case, below, we met our burden. We showed cause, we showed that we are secured creditors with a lien on property, that they are diverting our property, and that we are not adequately protected. Where is the evidence that we should look at that would cast serious doubt on the $19 million per month income stream that is being paid by the non-state non-commonwealth? Your Honor, the evidence is in the stipulated facts itself. It's all the statements by the very entities saying that those contributions are uncertain. They cannot, on the one hand, point to that future revenue stream and point to the hypothetical payments and then say, by the way, those are uncertain, we don't know that they will be paid. And remember, an evidentiary hearing was scheduled in this case. The commonwealth suggests, goes as far to say it was incumbent upon us to notify the court that we had other evidence to submit. That is somewhat disingenuous to say that. To understand the timing, a hearing was scheduled for November 3rd. The day before, the parties submitted joint stipulations, which we've gotten together and agreed to, in order to streamline the hearing. Everyone was fully aware that there were other points that parties intended to make. We notified the court that morning that there would be expert testimony. So the suggestion that we should have somehow told the court that we had other evidence or that it was clear to the court that these stipulations were the entire record that the parties had agreed to is frankly absurd. These were filed on November 2nd. The hearing was canceled on November 2nd. But as to the $19 billion a month, Mr. Chesley told us that what wasn't uncertain were the non-government contributions. That is not what they said, your honor. The commonwealth, in October, in its fiscal plan, said that those contributions of municipalities themselves were uncertain. That's what they wrote in their fiscal plan. They are saying here today that they are certain. I mean, they are saying essentially that all secured debt of Puerto Rico would be paid in full. That's what they suggested today. And yet they repeatedly say otherwise in pages and pages of their brief, talking about how they do not have money to pay their creditors. They cannot meet their debt. And neither the commonwealth nor ERS addressed today their prior statements that these contributions are uncertain. And with respect to the monthly contributions, your honor, it's currently $13.9 million in payments, silver interest payments only, that go through 2020. In 2020, principal payments kick in. And that gets bumped up a significant amount. I mean, at the end of the day, there was a hearing schedule that we were entitled to, statutorily entitled to under PROMISA, where we would have an expert testify where the commonwealth would put forth evidence on the adequate protection question. At a minimum, we were entitled to that hearing, and the district court incorrectly canceled it the night before it was to be held, and on the same day that these stipulated facts were submitted. One more brief point. The commonwealth, I apologize if I'm rude, but the commonwealth, you know, in discussing what an extraordinary case would be, has said that this court need not be concerned because what we're dealing with here is money and cash collateral, and that can be repeated. And in bankruptcy, cash collateral is actually entitled to the most protection because once it's been dissipated and spent, there's nothing left. And all that will be left here at the end of it, once they've dissipated and spent her money and she has admitted, is an unsecured claim. That is not enough. The Constitution requires more. Thank you. After the clerk adjourns us, I'd like counsel to remain at the table. One or more of us is going to come to the well to say hello. If there's nothing else, I take it. Well argued. Thank you. We'll do the best we can.